Reed R. Kathrein (SBN 139304)
Lucas E. Gilmore (SBN 250893)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, California 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
Email: lucasg@hbsslaw.com
        reed@hbsslaw.com

*Attorneys for Plaintiff Bundy Chung*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| BUNDY CHUNG, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SUPER MICRO COMPUTER, INC., CHARLES LIANG, DAVID WEIGAND, and YIH-SHYAN "WALLY" LIAW,<br><br>Defendants. | Case No. 5:26-cv-4394<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

COMPLAINT                                                          Case No. 5:26-cv-4394
011385-11/3568855 V5

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ...................................................................................................1

II.     JURISDICTION AND VENUE ............................................................................4

III.    PARTIES ...............................................................................................................5

IV.     BACKGROUND ...................................................................................................6

V.      EARLY PHASE OF DEFENDANTS' MATERIALLY FALSE AND
        MISLEADING STATEMENTS.............................................................................7

VI.     MISSED SEC FILING DEADLINES FORCE DEFENDANTS TO
        PROVIDE PARTIAL CORRECTIVE DISCLOSURES WITHOUT
        ADMITTING TO THE UNDERLYING EXPORT FRAUD ..............................9

VII.    LATER PHASE OF DEFENDANTS' MATERIALLY FALSE AND
        MISLEADING STATEMENTS.............................................................................13

VIII.   THE TRUTH FULLY EMERGES .........................................................................18

IX.     LOSS CAUSATION AND ECONOMIC LOSS...................................................19

X.      CLASS ACTION ALLEGATIONS ......................................................................22

XI.     INAPPLICABILITY OF STATUTORY SAFE HARBOR ..................................23

XII.    PRESUMPTION OF RELIANCE..........................................................................23

XIII.   SCIENTER .............................................................................................................25

XIV.    CLAIMS FOR RELIEF .........................................................................................27

COUNT I VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT
        AND RULE 10B-5(B) PROMULGATED THEREUNDER (AGAINST
        ALL DEFENDANTS) .............................................................................................27

COUNT II VIOLATIONS OF SECTION 20(A) OF THE EXCHNAGE ACT
        (AGAINST THE OFFICER DEFENDANTS).........................................................28

PRAYER FOR RELIEF ......................................................................................................29

JURY TRIAL DEMANDED................................................................................................29

Plaintiff Bundy Chung ("Plaintiff"), by and through his counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief are based upon, *inter alia*, counsel's investigation that included: (a) regulatory filings made by Super Micro Computer, Inc. ("Super Micro" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) press releases, presentations, and media reports issued and disseminated by the Company; (c) analyst and media reports concerning Super Micro; and (d) other public information regarding the Company.

## I.      INTRODUCTION

1.      Plaintiff seeks relief on behalf of all persons or entities that purchased or otherwise acquired Super Micro common stock during the period between February 2, 2024 and March 19, 2026, inclusive (the "Class Period"). The claims arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.      Super Micro is a technology company that builds and sells specialized computers designed to process requests, store data, run applications, and serve other computers – called, servers. Super Micro's servers are used to power data centers for companies training large artificial intelligence ("AI") models or running cloud computing services. Its flagship product are servers that integrate chips manufactured by Nvidia Corporation ("Nvidia"), and are capable of the heavy parallel computing that is need for AI training.

3.      Throughout the Class Period, Nvidia chips were subject to U.S. government export control laws that Super Micro and certain of the Company's senior officers (the "Defendants") sought to skirt by secretly and illegally selling Super Micro servers, embedded with Nvidia chips, to China. It is a U.S. national security priority to limit China's aggressively developing AI computing abilities. Beginning in October 2022, the U.S. Department of Commerce, through its Bureau of Industry and Security ("BIS"), implemented license requirements effectively barring the sale of certain American hardware that is core to expanding AI infrastructure – including certain Nvidia chips – to China and Hong Kong. License applications were subject to review under

- 1 -

a presumption of denial. Defendants illegally sold servers containing such chips to China, and in doing so, threatened American national security.

4. To conceal this illegal scheme and maintain an artificially inflated stock price, Defendants carried out a two-phase campaign of deception—both phases constituting a singular, continuous fraud designed to hide the export violations from investors. In the first phase, from February 2024 through August 2024, Defendants affirmed Super Micro's compliance with U.S. export control laws. In the second phase, from approximately December 2024 through February 2026, after Super Micro missed important SEC filing deadlines, the Company's auditor, Ernst & Young LLP ("EY"), resigned in part due to its concerns over at least eleven specific export transactions, and the Company's Special Committee began actively investigating Super Micro's compliance with relevant U.S. export laws and regulations—placing Defendants' prior compliance claims in question—Defendants shifted to active minimization and misdirection, selectively acknowledging certain problems while concealing the true scope of the ongoing conspiracy. Throughout both phases, Defendants made repeated false and misleading statements to investors, as alleged more fully below.

5. To carry out this first phase, Defendants deployed a coordinated set of public assurances across multiple channels. Through SEC filings signed and certified by Defendants Liang and Weigand, Defendants warned of potential risks of "failing to comply with laws and regulations restricting dealings with sanctioned countries or companies" and affirmed that they were not omitting material information that would render their statements misleading. Defendants also represented to media outlets that Super Micro followed all U.S. export requirements. These affirmative misrepresentations were designed to foreclose any suspicion that the Company was engaged in the very illegal activity that its co-founder was orchestrating.

6. This first phase continued until late Summer of 2024, when Defendants missed SEC filing deadlines, the Company's auditor EY resigned, and Defendants were forced to acknowledge the existence of an internal investigation conducted by an independent Special Committee appointed by the Board. These disclosures caused the price of Super Micro common stock to

- 2 -

significantly decline. These disclosures were directly related to the fraud. The Company would later admit on December 2, 2024 that EY's resignation was due in part to its expressed concern over at least eleven specific export transactions that it had noted and that the internal Special Committee inquiry concerned, among other things, Super Micro's compliance with relevant U.S. export laws and regulations. And as investors would later learn, EY's October 2024 resignation occurred at or around the same time that Defendant Liaw and another senior Super Micro employee was actively obstructing "auditors" carrying out the Company's own October 2024 export control compliance audit of transactions with a specific customer—conduct that is consistent with and helps explain EY's contemporaneous determination that it could no longer rely on representations from management or the Audit Committee. While revelatory, these disclosures were also misleading because they failed to admit to the core fraud of violating export laws—forcing Defendants to pivot to a second strategy of deception.

7. The second phase of Defendants' deception, from approximately December 19, 2024 through at least February 6, 2026, was characterized by active minimization and misdirection—a calculated effort to acknowledge the existence of problems while concealing their true scope and severity. Defendants selectively disclosed certain issues—such as the pendency of the Special Committee's investigation into export controls—while simultaneously concealing the ongoing conspiracy to evade U.S. export control laws, understating the Company's true exposure to China-related revenue, and continuing to certify the accuracy of public filings that omitted material facts about management's direct involvement in the scheme.

8. The truth was laid to bare on March 19, 2026. That day, a federal court unsealed the Department of Justice Grand Jury Indictment charging Defendant Liaw, another Super Micro senior employee Ruei-Tsang "Steven" Chang ("Chang"), and others with conspiring to divert high-performance Super Micro servers assembled in the United States and containing Nvidia AI chips to China, in violation of U.S. export control laws. The Indictment revealed Liaw's pivotal role in the scheme to evade the law, including for example, by staging non-working "dummy" servers, and repackaging servers in unmarked boxes to conceal their contents prior to shipment to China.

- 3 -

COMPLAINT                                                                 Case No. 5:26-CV-4394

The Indictment revealed that Defendants' scheme generated at least approximately $2.5 billion in sales to Company-1 (the majority of which were diverted to China).

9. The Indictment also drew a critical link between the Defendants' misconduct and Ernst & Young's October 2024 withdrawal from the engagement. The Indictment revealed that in October 2024, at or around the same time EY resigned, the rapid growth in orders from a particular company based in Southeast Asia, Company-1, had prompted Super Micro's own compliance team to place a temporary hold on shipments and initiate an audit—but Defendant Liaw and Chang took active steps to undermine that audit. These obstructive acts included preventing "auditors" from physically entering Company-1's purported data center facilities, arranging for an auditor Chang described in writing as "friendly" to conduct the review, and fabricating lease agreements to create the false appearance that Company-1 had sufficient data center capacity to justify its server purchases. While the Indictment does not specify the "auditors" whose access Defendants sought to obstruct, at a minimum, this pattern of obstructive conduct directed at the Company's own compliance processes corroborates and sheds light on EY's contemporaneous decision to resign in October 2024.

10. News of the Indictment drove the price of Super Micro shares down $10.26 (-33%) the next day.

11. As a result of Defendants' actions detailed herein, and the precipitous decline in the market value of Super Micro common stock, Plaintiff and other Class members have suffered significant losses and damages.

## II.    JURISDICTION AND VENUE

12. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §78aa, and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5). This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa.

13. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S. §78aa, and 28 U.S.C. §1391(b), because Super Micro's principal executive office is located in San

- 4 -

Jose, California, which is situated within this District, and many of the acts giving rise to the violations complained of in this action, including the preparation and dissemination of materially false and misleading statements, occurred in substantial part in this District. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

### III.    PARTIES

14.    As indicated in the certification submitted herewith, Plaintiff purchased Super Micro common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of federal securities laws alleged herein.

15.    Defendant Super Micro is a technology company that designs and manufactures, among other things, high performance servers and data storage systems. The Company maintains its headquarters at 980 Rock Avenue, San Jose, California. Super Micro's common stock trades on NASDAQ under the ticker symbol "SMCI." As of January 31, 2026, Super Micro had nearly 599 million shares of common stock outstanding, owned by thousands of investors.

16.    Defendant Charles Liang ("Liang") is, and was at all relevant times, Super Micro's Chief Executive Officer, Chairman of its Board of Directors, and its President.

17.    Defendant David Weigand ("Weigand") is, and was at all relevant times, Super Micro's Chief Financial Officer and Chief Compliance Officer.

18.    Defendant Yih-Shyan "Wally" Liaw ("Liaw") was at all relevant times Super Micro's co-founder, a member of its Board of Directors, and its Senior Vice President of Business Development until he abruptly resigned effective March 20, 2026.

19.    Defendants Liang, Weigand, and Liaw are collectively referred to herein as the "Officer Defendants." The Officer Defendants, because of their positions with Super Micro, possessed the power and authority to control the contents of Super Micro's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Officer Defendants was provided with copies of the Company's

- 5 -

reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, each of the Officer Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations being made were then materially false and/or misleading.

## IV. BACKGROUND

20. Super Micro is a publicly traded information technology company headquartered in San Jose, California that manufactures and sells enterprise-grade server systems, data storage solutions, and supporting hardware for use in data centers, cloud computing platforms, and artificial intelligence applications. The Company generates the substantial majority of its revenue from the sale of servers that incorporate graphics processing units ("GPUs") manufactured by Nvidia Corporation ("Nvidia"). Super Micro has cultivated a competitive advantage through its early access to Nvidia's latest GPU architectures, which enables the Company to bring new server configurations to market ahead of many of its rivals.

21. Beginning in October 2022, and pursuant to its authority under the Export Control Reform Act ("ECRA"), the U.S. Department of Commerce, through its Bureau of Industry and Security ("BIS"), imposed license requirements on the export and reexport of advanced computing chips—including certain Nvidia GPUs—and semiconductor manufacturing equipment to China and Hong Kong. License applications were subject to review under a presumption of denial. As a practical matter, these regulations barred the sale of high-performance AI chips, including the types of Nvidia chips integrated into many of Super Micro's flagship server products, to Chinese buyers.

22. These export restrictions were enacted to safeguard U.S. national security and foreign policy interests. As the Bureau of Industry and Security explained, the export restrictions target China's capacity "to produce advanced military systems including weapons of mass destruction; improve the speed and accuracy of its military decision making, planning, and

- 6 -

logistics, as well as of its autonomous military systems; and commit human rights abuses." The strategic significance of advanced AI accelerator hardware—and its potential applications in signals intelligence, autonomous weapons systems, nuclear weapons simulations, and other advanced military programs—is well understood by the U.S. government and by foreign governments and institutions that seek to acquire it.

23. At the time the restrictions were introduced, during Super Micro's November 1, 2022 Q1 2023 earnings call an analyst asked management whether they were seeing any impact from U.S.-imposed sanctions on China. Defendant Weigand assured the analyst and investors that "China sales last quarter were less than 3%. So we don't consider this to be a significant issue for us going forward."

### V. EARLY PHASE OF DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

24. The Class Period begins on February 2, 2024, when Super Micro filed a Form 10-Q with the SEC, for the final quarter of 2023. Liang and Weigand signed this filing and certified that the filing did "not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." This Form 10-Q incorporated by reference Part 1, Item 1A "Risk Factors" from Super Micro's annual report on Form 10-K for the year ended June 30, 2023 purporting to warn investors that "[i]f we fail to comply with laws and regulations restricting dealings with sanctioned countries or companies and/or persons on restricted lists, we may be subject to civil or criminal penalties."

25. On April 23, 2024, *Reuters* published "China acquired recently banned Nvidia chips in Super Micro, Dell servers, tenders show." According to the report, "Super Micro said it complied with U.S. requirements on the sale and export of GPU systems to regions and parties that require licenses." The report also quoted Super Micro: "If we become aware that a third party has exported or reexported without the required licenses, we investigate the matter and take appropriate action." In addition, *Reuters* said, "[i]n a letter to Reuters on behalf of Super Micro,

- 7 -

U.S. law firm Clare Locke said its client 'goes above and beyond what U.S. export restrictions require' by proactively taking steps to ensure its customers do not violate the curbs."

26. On April 30, 2024, Super Micro filed a current report on Form 8-K announcing its Q3 2024 financial results. Liang signed this filing and said "[w]e had yet another record quarter with fiscal Q3 revenue of $3.85 billion with non-GAAP EPS of $6.65 per share." He attributed the results to "[s]trong demand for AI rack scale PnP [Plug and Play] solutions[.]" The Company also raised its FY 2024 revenue guidance.

27. On May 6, 2024, Super Micro filed its quarterly report on Form 10-Q for the period ended March 31, 2024. Liang and Weigand signed this filing and certified that the filing did "not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." This Form 10-Q incorporated by reference Part 1, Item 1A "Risk Factors" from Super Micro's annual report on Form 10-K for the year ended June 30, 2023 purporting to warn investors that "[i]f we fail to comply with laws and regulations restricting dealings with sanctioned countries or companies and/or persons on restricted lists, we may be subject to civil or criminal penalties."

28. On August 6, 2024, Super Micro filed a current report on Form 8-K announcing the Company's Q4 and FY 2024 financial results. Liang signed this filing and said "Supermicro continues to experience record demand of new AI infrastructures propelling fiscal 2024 revenue up 110% year over year to $14.9 billion and non-GAAP earnings per share up 87% to $22.09."

29. On August 12, 2024 *The Information* published "Nvidia AI chip smuggling to China becomes an industry." Quoting a spokesperson from Super Micro, the article reported "'[w]e follow all US export *control* requirements on the sale, service, support, and export of GPU systems to regions and parties that require licenses under the Export Administration Regulations[]" and "[i]f Supermicro becomes aware that a third party has exported or reexported without the required licenses, it investigates the matter and takes appropriate action."

COMPLAINT                                                                Case No. 5:26-cv-4394

30. Defendants' representations as alleged in paragraphs 24–29 above were materially false and misleading and omitted to disclose material information to investors because, unknown to investors: (a) Defendant Yih-Shyan "Wally" Liaw, Super Micro's co-founder/director/Senior Vice President of Business Development, led a conspiracy to evade applicable export restriction laws during 2024 using one of the Company's largest customers ("Company-1"); (b) Defendant Liaw recognized the importance of Super Micro's business with Company-1 toward meeting Super Micro's quarterly sales goals, thanking Company-1 executives for the "help for June" and promising "[i]n return" to "help [Company-1] the whole year"; (c) by the fourth quarter of fiscal year 2024, Company-1 had become Super Micro's eleventh most profitable customer worldwide, accounting for approximately $99.7 million in revenue for the quarter, despite the fact that Company-1 did not have the capacity to store or use the massive quantities of servers it was purchasing; and (d) the boilerplate risk disclosures about potential adverse effects of non-compliance with export restrictions were made while non-compliance was already occurring.

## VI.    MISSED SEC FILING DEADLINES FORCE DEFENDANTS TO PROVIDE PARTIAL CORRECTIVE DISCLOSURES WITHOUT ADMITTING TO THE UNDERLYING EXPORT FRAUD

31. Super Micro's ability to maintain an artificially inflated stock price was threatened by its missing SEC filing deadlines in 2024. Missing these deadlines triggered regulatory problems with NASDAQ and contractual problems with the Company's lenders, placing additional financial and regulatory pressure on Super Micro. The financial pressure created by these missed deadlines and resulting compliance issues gave Defendants an additional motive to continue and accelerate the illegal export scheme, as the conspiracy generated substantial revenue that helped the Company meet its financial obligations. While Defendants were forced to publicly acknowledge the delayed filings, Defendants offered reasons that were administrative in nature and continued to conceal the true scheme at play, preserving Super Micro's artificially inflated stock price for as long as possible.

32. Specifically, on August 28, 2024, Super Micro stunned investors when it announced in a press release that it would not timely file its annual report on Form 10-K for the fiscal year ended June 30, 2024. In response to the August 28 press release, the price of Super

- 9 -

COMPLAINT                                                                Case No. 5:26-cv-4394

Micro common stock plummeted 19%, from a closing price of $54.76 on August 27, 2024 to a closing price of $44.35 on August 28, 2024 (pre-split equivalent).

33. On August 30, 2024, Super Micro would later explain in its Form NT 10-K that the delay in filing its annual report was related to "information that was brought to the attention of the Audit Committee of the Company's Board of Directors" which resulted in the Board forming "a committee to review certain of the Company's internal controls and *other matters*[.]" (emphasis added). While this disclosure admitted to the existence of problematic "other matters", it provided no information about those matters. As set forth below, the disclosure was directly related to the fraud, as investors would later learn that, among other matters, the internal Special Committee's probe concerned whether Super Micro complied with relevant U.S. export laws and regulations.

34. Then, on October 30, 2024, Super Micro filed a current report on Form 8-K stating that on October 24, 2024, EY, the Company's auditor had sent the members of the Audit Committee of Super Micro's Board of Directors a letter of resignation as the Company's registered public accounting firm. According to the filing, "[i]n late July 2024, EY communicated to the Audit Committee concerns about several matters," including those relating to "transparency and completeness of communications to EY," and "that the timely filing of the Company's annual report was at significant risk." The October 30 8K explained that in response to EY's late July 2024 express concerns, the Board appointed an independent special committee of the Board (the "Special Committee") to review the matters. The October 30 8K stated that following the receipt of new information through the Review process, EY resigned after determining they could no longer rely on representations from management or the Audit Committee. In response to this news, the price of Super Micro shares fell $16.05 (-32.6%) that day.

35. As set forth below, EY's decision to resign was the direct and foreseeable result of the fraud. The Company would later admit that EY's resignation was due in part to its concern over at least eleven specific export transactions that it had noted and that the Special Committee's inquiry expressly concerned whether Super Micro complied with relevant U.S. export laws and regulations for these transactions. Moreover, as later revealed by the Indictment, EY's October

- 10 -

2024 resignation occurred at or around the same time that Defendants Liaw and Chang were actively obstructing auditors carrying out the Company's own internal compliance audit of Company-1—an audit prompted by the rapid growth in Company-1's orders. The Indictment states that Liaw and Chang prevented auditors from physically entering Company-1's purported data center facilities, arranged for an auditor Chang described in writing as "friendly" to conduct the review, and fabricated lease agreements to create the false appearance that Company-1 had sufficient data center capacity to justify its server purchases. This pattern of obstructive conduct directed at the Company's own compliance processes aligns with the circumstances surrounding EY's resignation and underscores the reasons for its October 2024 exit.

36.     Then, on November 13, 2024, Super Micro filed its Form NT 10-Q announcing that it would not timely file its Q1 2025 quarterly financial report on Form 10-Q for the period ended September 30, 2024 due to unspecified "other matters" and unspecified "other work that is ongoing[.]" This disclosure was consistent with, and a direct consequence of, the same underlying issues that prompted the October 30, 2024 disclosure regarding the Special Committee's investigation into "matters" raised by EY – but once again omitted any reference to the export fraud that was, at that very time, continuing under Defendant Liaw's direction.

37.     On December 2, 2024, Super Micro filed a current report on Form 8-K signed by Liang, accompanied by a press release, which revealed additional detail about the Special Committee's investigation of the "matters" raised by EY, as first disclosed on October 30, 2024. The filing confirmed that, among other issues, EY had raised concerns about "[e]xport control matters." Specifically, according to the filing, EY had noted 11 specific export transactions. Consequently, the Special Committee's "Review focused on whether, at the time of shipment, transactions complied with relevant U.S. export laws and regulations" related to the prevention of sales or diversion to restricted countries. The December 2 filing further stated that the "Special Committee relied in part on work conducted as part of the Company's regular compliance processes by outside counsel and on a separate export control review recently conducted by other outside counsel." The December 2 filing stated, however, that the Special Committee "did not see

- 11 -

COMPLAINT                                                                 Case No. 5:26-cv-4394

any evidence suggesting that anyone at the Company tried to circumvent export control regulations or restrictions, or that anyone at the Company was aware that any of its products might be diverted to a prohibited end user or location." The press release represented, however, that the Special Committee's review of 11 specific export transactions "did not give rise to any substantial concerns about the integrity of Supermicro's senior management or Audit Committee."

**Export control matters**

- The Special Committee also reviewed 11 specific export transactions noted by EY. The Review focused on whether, at the time of shipment, transactions complied with relevant U.S. export laws and regulations. The Special Committee also reviewed certain allegations of export control violations contained in a short-seller report released on August 27, 2024 (the "Short Seller Report").

- The Special Committee relied in part on work conducted as part of the Company's regular compliance processes by outside counsel and on a separate export control review recently conducted by other outside counsel. In addition, the Special Committee investigated sales data from these transactions and conducted a targeted email review and collection of documents from 34 individuals.

- The Special Committee did not see any evidence suggesting that anyone at the Company tried to circumvent export control regulations or restrictions, or that anyone at the Company was aware that any of its products might be diverted to a prohibited end user or location. The Special Committee also did not identify products that were sold to Russian customers or shipped to Russia in violation of export controls or sanctions laws that were in place when products were shipped.

- Based on its Review, the Special Committee concluded it appears the Company has implemented a reasonable program for compliance with applicable export control regulations.

38.    These representations were both revelatory and materially false and misleading. As the Indictment later revealed, Defendant Liaw was at that very time orchestrating the diversion of servers to China through Company-1, including by pressing Individual-1 to increase orders for Nvidia B200-equipped servers for diversion to China. As also revealed by the Indictment, in October 2024, the rapid growth in orders from Company-1 had prompted Super Micro's own compliance team to place a temporary hold on shipments and initiate an audit—but Defendant Liaw and Chang took active steps to undermine that audit, including by conspiring to prevent auditors from physically entering Company-1's purported data center facilities, arranging for an

auditor Chang described in writing as "friendly" to conduct the review, and fabricating lease agreements to create the false appearance that Company-1 had sufficient data center capacity to justify its server purchases. Moreover, just twelve days after the Special Committee announced its findings, on or about December 14, 2024, Liaw texted Individual-1: "Roughly how many you can take by January? Feb? March? April? Just roughly forecast will be fine … Then we can propose to [Nvidia] with the way they can accept." The Defendants' intended effect of their 2024 disclosures were to reassure investors and maintain the price of Super Micro common stock, and thus the price of Super Micro common stock continued to trade at artificially inflated prices.

## VII.    LATER PHASE OF DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

39.    While Defendants admitted to an internal audit investigation related to exports, Defendants continued to make false and misleading statements that concealed their illegal export activity to China from investors and maintained an artificially inflated stock price for as long as possible.

40.    On December 19, 2024 *Reuters* published a second article in which Defendants are quoted as disclaiming any illegal export activity. According to the article, which was entitled, "US prompts Nvidia probe into how chips ended up in China, The Information reports", Nvidia asked Super Micro to conduct spot checks of their customers in Southeast Asia, noting that Nvidia chips are embedded in server products made by Super Micro. Super Micro reportedly told *Reuters* "Supermicro follows all U.S. export control requirements on the sale and export of GPU systems to regions and parties that require licenses under the Export Administration Regulations."

41.    During December 2024, Super Micro published its updated Export Compliance Policy (External) assuring investors that "[i]t is the policy of Super Micro Computer, Inc. […] to fully comply with all export and re-export control laws of the United States." The Company also said that "[t]his document establishes Supermicro's export control guidelines and practices and is consistent with Export Management System ('EMS') parameters established by the U.S. Department of Commerce, Bureau of Industry and Security ('BIS')." The Company further stated that "[a]ll [Super Micro] employees are responsible for complying with this policy." Significantly,

- 13 -

these representations were published at the very time that, according to the Indictment, Liaw was pressing Individual-1 to place more substantial purchase orders for servers that would be diverted to China, texting Individual-1 on or about December 14, 2024: "Roughly how many you can take by January? Feb? March? April? Just roughly forecast will be fine … Then we can propose to [Nvidia] with the way they can accept … This is the only way to have [Nvidia] to promise the B200 allocation so far as I know."

42. On February 25, 2025, Super Micro filed its long-awaited Form 10-K for the year ended June 30, 2024. Liang, Weigand and Liaw signed this filing. Liang and Weigand certified the filing did "not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." This filing purported to warn that "[i]f we fail to comply with laws and regulations restricting dealings with sanctioned countries or companies and/or persons on restricted lists, we may be subject to enforcement actions, including civil or criminal penalties."

43. Defendants also stated within this 10-K the following boilerplate risk disclosure about Super Micro's compliance with applicable import and export laws:

> Although we attempt to ensure that we, our suppliers, resellers, and partners comply with the applicable import, export, and sanctions laws, we cannot guarantee full compliance by all. Actions of our suppliers, resellers and partners are not within our complete control, and **our products could be re-exported to sanctioned persons or countries or provided by our retailers to third persons in contravention of our requirements or instructions or the laws**. . . . Any such potential violation by us, our suppliers, resellers, or our partners could have negative consequences, including government inquiries, investigations, enforcement actions, monetary fines, or civil and/or criminal penalties, and our reputation, brand, and revenue may be harmed. [emphasis added]

44. Also on February 25, 2025, Super Micro filed its Form 10-Q for the final quarter of 2024. The filings were signed by Liang, Weigand, and Chief Accounting Officer Kenneth Cheung. In it, Liang and Weigand certified that the filing did "not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period

covered by this report." Both of these Forms 10-Q incorporated by reference Part 1, Item 1A "Risk Factors" of Super Micro's 2024 Form 10-K filed on February 25, 2025 purporting to warn investors that "[i]f we fail to comply with laws and regulations restricting dealings with sanctioned countries or companies and/or persons on restricted lists, we may be subject to enforcement actions, including civil or criminal penalties."

45. On May 6, 2025, Super Micro held its Q3 2025 earnings call. During the call, Weigand downplayed the Company's exposure to China, stating "China continued to represent less than 1% of sales in Q3." This representation was materially misleading because, as the Indictment later revealed, "between late April 2025 and mid-May 2025 alone, over approximately $510 million worth of [Super Micro's] servers assembled in the United States with Nvidia GPUs – and subject to U.S. export controls – were sold to Company-1 and then diverted to China." Indeed, within days of Weigand's statement, on or about May 8, 2025, Company-1 purchased approximately 58 servers with Nvidia B200 GPUs for approximately $17.4 million; on May 12, 2025, approximately 60 additional servers for approximately $18 million; and on May 15, 2025, approximately 60 more servers for approximately $18 million—all of which were diverted to China through the defendants' network of brokers.

46. On May 12, 2025, Super Micro filed its quarterly report for the period ended March 31, 2025. Liang, Weigand, and Cheung signed this filing. Liang and Weigand certified that the filing did "not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." This 10-Q also incorporated by reference Part 1, Item 1A "Risk Factors" of Super Micro's 2024 Form 10-K filed on February 25, 2025 purporting to warn investors that "[i]f we fail to comply with laws and regulations restricting dealings with sanctioned countries or companies and/or persons on restricted lists, we may be subject to enforcement actions, including civil or criminal penalties."

- 15 -

47. On August 5, 2025, Super Micro held its Q4 2025 earnings call. During this call, Liang touted fiscal 2025 results representing "a 47% year-on-year revenue growth at $22 billion," reflecting "continued strong demand for our AI and Green Computing solutions."

48. On August 28, 2025, Super Micro filed its annual report on Form 10-K for the year ended June 30, 2025. Liang, Weigand and Liaw signed this filing. Liang and Weigand certified that the filing did "not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." This Form 10-K purported to warn investors within the filing's "Government Regulation" section that "[i]f we fail to comply with laws and regulations restricting dealings with sanctioned countries, companies and/or persons subject to restricted party lists or parties engaged in restricted end uses, we may be subject to enforcement actions, including civil or criminal penalties."

49. On November 7, 2025, Super Micro filed its quarterly report on Form 10-Q for the period ended September 30, 2025. Liang, Weigand, and Cheung signed this filing. Liang and Weigand certified that the filing did "not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." This Form 10-Q assured investors that "[t]here have been no material changes from the risk factors discussed in our Annual Report on Form 10-K for the fiscal year ended June 30, 2025." These included the 10-K's purported warning to investors that "[i]f we fail to comply with laws and regulations restricting dealings with sanctioned countries, companies and/or persons subject to restricted party lists or parties engaged in restricted end uses, we may be subject to enforcement actions, including civil or criminal penalties."

50. On February 6, 2026, Super Micro filed its quarterly report on Form 10-Q for the period ended December 31, 2025. Liang, Weigand, and Cheung signed this filing. Liang and Weigand certified the filing did "not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which

- 16 -

COMPLAINT                                                                    Case No. 5:26-CV-4394

such statements were made, not misleading with respect to the period covered by this report." This Form 10-Q assured investors that "[t]here have been no material changes from the risk factors discussed in our Annual Report on Form 10-K for the fiscal year ended June 30, 2025." These included the 10-K's purported warning to investors that "[i]f we fail to comply with laws and regulations restricting dealings with sanctioned countries or companies and/or persons subject to restricted party lists or parties engaged in restricted end uses, we may be subject to enforcement actions, including civil or criminal penalties."

51. Defendants' representations as alleged in paragraphs 40–50 above were materially false and misleading and omitted to disclose material information to investors because, unknown to investors: (a) Defendant Yih-Shyan "Wally" Liaw, Super Micro's co-founder/director/Senior Vice President of Business Development, led a conspiracy to evade applicable export restriction laws through 2025 using one of the Company's largest customers ("Company-1"); (b) the conspiracy enabled Super Micro to unlawfully sell at least approximately $2.5 billion of its servers from 2024 through 2025, a substantial portion of which was revenue the Company reported to investors as legitimate sales; (c) in April 2025, Super Micro's compliance team imposed a second hold on shipments to Company-1 and initiated another audit, which Liaw and his co-conspirators undermined by drafting persuasive responses to the compliance team, after which Company-1's purchase orders "ballooned" to approximately $510 million in a matter of weeks; (d) in August 2025, BIS informed Super Micro that it had reason to believe that Company-1 was diverting the Company's servers to China and requested a compliance hold on all Super Micro shipments to Company-1, yet Defendants continued to file SEC reports certifying the accuracy of financial statements and representing that export control risks were merely hypothetical; (e) Defendants staged "dummy" non-working servers and fabricated data center lease agreements to deceive the Company's own compliance team during the August 2025 audit; (f) in December 2025, when a BIS export control officer conducted a post-shipment verification of Company-1's warehouse, co-conspirator Sun impersonated a law firm assistant and presented the officer with dummy servers staged the previous day, yet Defendants continued to publicly represent compliance with all export

- 17 -

control laws; and (g) boilerplate risk disclosures about potential adverse effects of non-compliance with export restrictions were made while non-compliance was already occurring.

### VIII. THE TRUTH FULLY EMERGES

52. The truth contradicting Super Micro's statements was fully revealed after the market closed on March 19, 2026. That day, a federal court unsealed the Department of Justice Grand Jury Indictment charging Liaw, Chang (Super Micro's sales manager of its Taiwan office), Ting-Wei ("Willy") Sun ("Sun," a third party broker) (collectively, the "Indictment defendants" or "defendants") with conspiring to divert high-performance Super Micro servers assembled in the United States containing NVIDIA AI chips through one of Super Micro's largest customers ("Company-1") to China, in violation of U.S. export control laws. Liaw and one of his co-conspirators were arrested that day.

53. The Indictment added critical context to the August 28, 2024 and October 30, 2024 partial corrective disclosures. Specifically, the Indictment states that the "rapid growth in orders from Company-1 prompted the U.S. Manufacturer's [Super Micro's] compliance team to place a temporary hold on shipments and initiate" an "October 2024 Audit" which Liaw and Chang worked to undermine. For example, Chang worked to "prevent auditors from physically entering the areas of the data centers where Company-1 was purportedly keeping the servers it had purchased from the U.S. Manufacturer (but which, in reality, had been diverted to China)." At the same time, Defendant Liaw worked to falsify lease agreements to cover their tracks in case of another future audit. All the while, Liaw and Chang also "worked to grow the U.S. Manufacturer's business in China by encouraging Company-1 to increase the speed and size of its orders." For example, "on or about December 14, 2024, LIAW texted Individual-1, 'Roughly how many you can take by January? Feb? March? April? Just roughly forecast will be fine… Then we can propose to [Nvidia] with the way they can accept.'" The Indictment further detailed that these servers were repackaged and placed in unmarked boxes to conceal their content prior to shipping them to their final destinations in China.

COMPLAINT                                                                  Case No. 5:26-cv-4394

54. The Indictment quantified benefits received by Super Micro from the co-conspirators' scheme. "Since in or about 2024, the defendants and their co-conspirators caused the sale of at least approximately $2.5 billion worth of [Super Micro's] servers to Company-1" and "between late April 2025 and mid-May 2025 alone, over approximately $510 million worth of [Super Micro's] servers assembled in the United States with Nvidia GPUs – and subject to U.S. export controls – were sold to Company-1 and then diverted to China."

55. In response, the price of Super Micro shares fell $10.26 (-33%) the next day.

## IX.    LOSS CAUSATION AND ECONOMIC LOSS

56. During the Class Period, as detailed herein, Defendants made materially false and misleading statements; engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Super Micro common stock; and operated as a fraud or deceit on the Class Period purchasers of Super Micro's securities by materially misleading the investing public. As set forth below, Defendants' prior misrepresentations and fraudulent conduct became apparent to the market through a series of partial corrective disclosures and a final corrective disclosure, each of which revealed previously concealed information about the Company's illegal export activity, causing the price of Super Micro common stock to decline as the artificial inflation was removed. The price declines described below were not caused by intervening, changed market conditions, or other factors unrelated to the Defendants' fraud, but were the direct and foreseeable consequence of the revelation of the truth that Defendants had concealed.

57. First, on August 28, 2024, Super Micro announced in a press release that it would not timely file its annual report on Form 10-K for the fiscal year ended June 30, 2024. In response to the August 28 press release, the price of Super Micro common stock declined 19%, from a closing price of $54.76 on August 27, 2024 to a closing price of $44.35 on August 28, 2024 (pre-split equivalent). This partial corrective disclosure was directly related to the Defendants' fraudulent scheme and prior false and misleading statements assuring compliance with export control laws. As the Company would later confirm, the reason for the delay in filing the annual report was due to an internal Special Committee probe concerning, among other things, whether

- 19 -

Super Micro complied with relevant U.S. export laws and regulations.  However, because the August 28, 2024 disclosure omitted Super Micro's evasion of U.S. export control restrictions and the illegal diversion of servers to China, the price of Super Micro common stock continued to trade at artificially inflated prices.

58.    Second, on October 30, 2024, Super Micro filed a Form 8-K disclosing that: (i) on October 24, 2024, EY sent the members of the Company's Audit Committee a letter of resignation as the Company's registered public accounting firm; (ii) EY's resignation followed initial concerns raised by EY in late July 2024 regarding transparency, the completeness of management's communications, and the Company's ability to file its annual report on time; and (iii) in response to EY's initial late July 2024 concerns, the Board formed an Independent Special Committee to investigate. However, during this review process, EY received new information that led them to conclude they could no longer rely on representations from either management or the Audit Committee. In response, the price of Super Micro common stock fell $16.05 per share, or 32.6%, from a closing price of $49.12 on October 29, 2024 to a closing price of $33.07 on October 30, 2024. This partial corrective disclosure was directly related to the Defendants' fraudulent scheme and prior false and misleading statements assuring compliance with export control laws. As the Company would later admit, EY's resignation was due in part to its concern over at least eleven specific export transactions that it had noted and that the Special Committee's inquiry expressly concerned whether Super Micro complied with relevant U.S. export laws and regulations for these transactions. Indeed, as the Indictment later revealed, EY's resignation occurred at or around the same time that Defendant Liaw and Chang were actively obstructing auditors carrying out the Company's own October 2024 compliance audit of Company-1—conduct that is consistent with and helps explain EY's stated inability to continue relying on management representations. However, because the October 30 disclosure omitted Super Micro's evasion of export control restrictions and the illegal diversion of servers to China, the price of Super Micro common stock continued to trade at artificially inflated prices.

COMPLAINT                                                                                    Case No. 5:26-CV-4394

59. Third, the truth about Super Micro's export control violations was fully revealed after the market closed on March 19, 2026, when a federal court unsealed the Department of Justice Grand Jury Indictment charging Defendant Liaw, Chang, and Sun with conspiring to divert high-performance Super Micro servers assembled in the United States and containing Nvidia AI chips to China, in violation of U.S. export control laws. The Indictment revealed, for the first time, the full scope of the illegal scheme—including that the conspiracy generated at least approximately $2.5 billion in sales to Company-1, the majority of which were diverted to China; that Defendants staged "dummy" servers to deceive the Company's own compliance team; that servers were repackaged in unmarked boxes to conceal their contents prior to shipment to China; and that Defendants fabricated data center lease agreements. The Indictment directly contradicted Defendants' representations throughout the Class Period that Super Micro "follow[ed] all US export requirements," that the Audit Committee "did not see any evidence suggesting that anyone at the Company tried to circumvent export control regulations or restrictions," and that "China continued to represent less than 1% of sales." In response to the unsealing of the Indictment, the price of Super Micro shares fell $10.26 per share, or 33%, from a closing price of $30.79 on March 19, 2026 to a closing price of $20.53 on March 20, 2026. This decline was a direct and proximate result of the revelation of the previously concealed truth about the Company's illegal export scheme, and was not caused by any intervening or independent factor.

60. The economic losses suffered by Plaintiff and the Class were thus caused by the materialization of the concealed risk of which Defendants were aware but failed to disclose. Had Defendants truthfully disclosed that Super Micro was illegally exporting servers containing Nvidia AI chips to China in violation of U.S. export control laws, rather than repeatedly assuring investors of compliance, the price of Super Micro common stock would not have been artificially inflated during the Class Period, and Plaintiff and the Class would not have purchased the stock at inflated prices or would not have purchased it at all. The corrective disclosures described above each revealed new information that was previously concealed by Defendants' false and misleading statements, and each caused a statistically significant decline in the price of Super Micro common

- 21 -

COMPLAINT                                                    Case No. 5:26-CV-4394

stock that was not attributable to general market conditions. As a result of their purchases of Super Micro common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## X.   CLASS ACTION ALLEGATIONS

61.   Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of persons or entities that purchased or otherwise acquired Super Micro common stock during the Class Period (collectively, the "Class"). Excluded from the Class are Defendants and their families, directors, and officers of Super Micro and their families and affiliates.

62.   The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of January 31, 2026, there were nearly 599 million shares of Super Micro common stock outstanding that were owned by thousands of investors.

63.   There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to members of the Class which predominate over questions which may affect individual Class members include:

(a)   Whether Defendants violated the Exchange Act;

(b)   Whether Defendants omitted and/or misrepresented material facts;

(c)   Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)   Whether the Officer Defendants are personally liable for the alleged misrepresentations and omissions alleged herein;

(e)   Whether the Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(f)   Whether Defendants' conduct impacted the price of Super Micro common stock;

- 22 -

COMPLAINT                                                                 Case No. 5:26-CV-4394

(g)    Whether Defendants' conduct caused Plaintiff and the other members of the Class to sustain damages; and

(h)    The extent of damage sustained by Plaintiff and the other members of the Class and the appropriate measure of damages.

64.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages because of Defendants' wrongful conduct.

65.    Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

66.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Joinder of all Class members is impracticable.

## XI.    INAPPLICABILITY OF STATUTORY SAFE HARBOR

67.    Super Micro's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

68.    The Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement made was false or misleading and the statement was authorized and/or approved by an executive officer of Super Micro who knew that the statement was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## XII.    PRESUMPTION OF RELIANCE

69.    At all relevant times, the market for Super Micro common stock was an efficient market for the following reasons:

- 23 -

COMPLAINT                                                                Case No. 5:26-CV-4394

(a)   Super Micro common stock met the requirements for listing, and was listed and actively traded on NASDAQ, a highly efficient and automated market;

(b)   As a regulated issuer, Super Micro filed periodic public reports with the SEC and NASDAQ;

(c)   Super Micro regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)   Super Micro was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

70.   As the result of the foregoing, the market for Super Micro common stock promptly digested current information regarding Super Micro from all publicly available sources and reflected such information in the price of Super Micro common stock. Under these circumstances, the purchasers of Super Micro common stock during the Class Period suffered similar injury through their purchase of Super Micro common stock at artificially inflated prices and the presumption of reliance applies.

71.   A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding Super Micro's business operations – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment

- 24 -

COMPLAINT    Case No. 5:26-cv-4394

decisions. Given the significance of Super Micro's compliance with United States export control requirements applicable to sale and export of NVIDIA chips, that requirement is satisfied here.

## XIII.  SCIENTER

72. As alleged herein, the Defendants acted with scienter since they knew that the public documents and statements issued or disseminated in the name of Super Micro were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. The strong inference of scienter arises from three independent and mutually reinforcing categories of evidence: (i) Defendant Liaw's actual knowledge, as demonstrated by his direct orchestration of the illegal export scheme; (ii) Defendants Liang's and Weigand's severe recklessness in certifying the accuracy of SEC filings; and (iii) the core operations doctrine, as the illegal export activity generated at least approximately $2.5 billion in revenue for Super Micro—constituting a significant portion of the Company's total sales during the Class Period—making it implausible that the Company's most senior officers were unaware of the scheme.

73. According to the Indictment, Defendant Liaw was intimately involved in orchestrating the scheme to subvert export controls and smuggle banned Nvidia chips into China. The Indictment reveals that Liaw coordinated directly with executives of the Southeast Asian passthrough company on order volumes, timing, and GPU allocations. By June 2024, Liaw recognized the passthrough company's importance to Super Micro's financial performance in meeting quarter-end sales goals, thanking its executives for the "help for June" and promising "[i]n return" to "help [Company-1] the whole year." Liaw also directed the passthrough company to transfer tens of millions of dollars to Super Micro so that the Company could place Nvidia GPU allocation orders and reserve inventory for subsequent diversion to China. The Indictment further makes reference to text messages between Defendant Liaw and the employees at the Southeast Asian passthrough company directing them to make purchases of Super Micro servers for diversion to China, and to have purported data center lease agreements in place "in case [of an]

COMPLAINT

audit later." In addition, after the August 2025 compliance audit was completed using staged dummy servers, Liaw was sent photographs and videos of the dummy servers by a co-conspirator, to which Liaw responded, "That's spectacular!" and immediately pressed to place more purchase orders, writing "Order now!" Moreover, Liaw demonstrated awareness of the illegality of his conduct: when a broker sent him a link to a U.S. Department of Justice press release regarding individuals arrested for illegally smuggling AI chips to China, Liaw responded with sobbing emojis – yet continued to coordinate diversions of servers to China. Scienter is further supported by Defendant Liaw's "resignation" the day after he was arrested.

74. Further, given the repeated reports of Super Micro servers containing Nvidia AI chips being reexported to China, including the December 2024 request from Nvidia for Super Micro to verify that its customers in Southeast Asia still had possession of their servers, the Officer Defendants were at a minimum reckless in providing assurances to investors that they were in compliance with U.S. export control laws. The Indictment reveals that, in or about August 2025, BIS informed Super Micro that it had reason to believe that Company-1 was diverting Super Micro's servers to China and requested a compliance hold on all shipments to Company-1. Despite this direct notice from BIS, Defendants continued to file SEC reports certifying the accuracy of the Company's financial statements and representing that export control risks were merely hypothetical. In addition, the Indictment reveals that in or about April 2025, Super Micro's compliance team again temporarily paused shipments to Company-1, yet Liaw directed co-conspirators to draft persuasive responses to the compliance team, and after the hold was lifted, Company-1's purchase orders to Super Micro "ballooned," with at least approximately $510 million in servers diverted to China in a matter of weeks.

75. Collectively, these facts give rise to a strong inference of scienter. Taken together, they demonstrate that Defendant Liaw had actual knowledge of the illegal export scheme he orchestrated; that Defendant Liang and Defendant Weigand were, at a minimum, severely reckless in certifying the accuracy of SEC filings and assuring compliance with export control laws in the face of repeated red flags—including internal compliance holds, Nvidia's request for customer

COMPLAINT                                                                  Case No. 5:26-cv-4394

spot checks, BIS's direct notification of suspected diversion, and media reports of Nvidia chip smuggling to China; and that all Officer Defendants knowingly or recklessly concealed the true scope and nature of the Company's export control violations from investors. The inference of scienter is at least as compelling as any opposing inference of innocent conduct.

## XIV.    CLAIMS FOR RELIEF

## COUNT I

### Violations of Section 10(b) of The Exchange Act and Rule 10b-5(b) Promulgated Thereunder (Against All Defendants)

76.    Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein.

77.    During the Class Period, the Defendants carried out a plan, scheme, and course of conduct that intended to and, throughout the Class Period, did: (a) deceive the investing public, including Plaintiff and the other members of the Class; and (b) cause Plaintiff and the other members of the Class to purchase Super Micro common stock at artificially inflated prices.

78.    The Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of Super Micro common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

79.    The Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the U.S. mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Super Micro's financial well-being, operations and prospects.

80.    During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

- 27 -

81.    The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or recklessly disregarded the true facts that were available to them. The Defendants engaged in this misconduct to conceal Super Micro's true condition from the investing public and to support the artificially inflated prices of the Company's common stock. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they purchased Super Micro common stock at artificially inflated prices and were harmed when the truth about Super Micro negatively impacted the price of the Company's common stock. Plaintiff and the Class would not have purchased Super Micro common stock at the prices they paid, or at all, had they been aware that the market prices of Super Micro common stock had been artificially inflated by Defendants' fraudulent course of conduct.

82.    As a direct and proximate result of the Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of Super Micro common stock during the Class Period.

83.    By virtue of the foregoing, the Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

**Violations of Section 20(a) of the Exchnage Act**
**(Against the Officer Defendants)**

84.    Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein.

85.    The Officer Defendants acted as controlling persons of Super Micro within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions, participation in and awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and intimate knowledge of the Company's actual performance, and their power to control public statements about Super Micro, the Officer Defendants had the power and ability to control the actions of Super Micro and its employees. By reason of this conduct, the Officer Defendants are liable under Section 20(a) of the Exchange Act.

- 28 -

COMPLAINT                                                                                Case No. 5:26-CV-4394

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of Plaintiff and the other Class Members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Such other further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

DATED: May 12, 2026     Respectfully submitted,

            HAGENS BERMAN SOBOL SHAPIRO LLP


By */s/ Lucas E. Gilmore*
  Lucas E. Gilmore (SBN 250893)
Reed R. Kathrein (SBN 139304)
715 Hearst Avenue, Suite 300
Berkeley, California 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
Email: lucasg@hbsslaw.com
reed@hbsslaw.com

*Attorneys for Plaintiff Bundy Chung*

- 29 -